## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**TAIVON APLES, ET AL.**                                    **CIVIL ACTION**

**VERSUS**                                                          **NO. 20-2451**

**ADMINISTRATORS OF THE TULANE**                 **SECTION: D (4)**
**EDUCATIONAL TRUST, ET AL.**

## <u>ORDER AND REASONS</u>

Before the Court is a Motion for Summary Judgment[1] filed by the Tulane Defendants.[2]  The Plaintiffs, Taivon Aples[3] and T.A., Jr., oppose the Motion.[4]  The Tulane Defendants filed a Reply in support of their Motion.[5]  After careful consideration of the parties' memoranda, the record, and the applicable law, the Court **GRANTS** the Motion for Summary Judgment.

---

[1] R. Doc. 65.

[2] The Tulane Defendants include The Administrators of the Tulane Educational Fund d/b/a Tulane University ("Tulane" or "Tulane University"); Kirk Bouyelas ("Bouyelas") in his official capacity as Chief of Police for Tulane Police Department; Lieutenant Denis Serena ("Serena"), individually and officially; Detective David Harris ("Harris"), individually and officially; Sergeant Brian Dew ("Dew"), individually and officially; Officer Joseph Elfer ("Elfer"), individually and officially; and Officer Matthew Winchester (Winchester"), individually and officially.  Since the filing of this Motion, the Court granted the Tulane Defendants' Motion to Dismiss, *see* R. Doc. 110, dismissing all of Plaintiffs' claims except the excessive force claims against Harris.  However, for clarity, the Court refers throughout to "Tulane Defendants" or "Defendants."

[3] Plaintiff Aples passed away on October 25, 2022.  *See* R. Doc. 104-4.  This Court subsequently granted the Plaintiffs' Motion to Substitute Proper Party Plaintiffs on July 31, 2023, substituting Alneshia Polite, on behalf of her minor child, T.A., Jr., and Paulina Bryant, on behalf of her minor child, T.B., as the Plaintiffs in this matter.  *See* R. Doc. 109.  Both T.A., Jr. and T.B. are the minor children of Taivon Aples.  For the purpose of clarity, the Court refers to the deceased, Aples, as the "Plaintiff" in this matter.

[4] R. Doc. 73.

[5] R. Doc. 81.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This Court has previously detailed the factual background of the events germane to this lawsuit in prior Orders.[6]  Accordingly, the Court provides relevant background only as it relates to the instant Motion for Summary Judgment.

This civil rights action arises out of an incident that took place on Tulane University's campus on September 6, 2019 when Plaintiff Taivon Aples ("Aples"), a former employee of Sodexo, Inc., was on Tulane's campus to pick up his final paycheck from Sodexo.[7]  Earlier, on August 23, 2019, the Tulane University Police Department ("TUPD") received a report that Aples had masturbated in front of another male Sodexo employee.[8]  Aples allegedly threatened the employee to not contact the police, telling the employee "Don't f---ing do anything," ejaculated in the employee's office, and then left the office.[9]  Following the report, TUPD officers, including Lieutenant Dennis Serena, Sergeant Brian Dew, and Officer Joseph Elfer, investigated the incident and subsequently secured an arrest warrant for Aples on charges of obscenity and simple assault.[10]

On September 5, 2019, a Sodexo employee informed Serena that Aples had returned to Tulane's campus to pick up his final paycheck, apparently without success.[11]  Serena arranged with Sodexo to have Aples return the following day—September 6, 2019—under the guise of picking up his paycheck so that TUPD officers

---

[6] *See, e.g.*, R. Docs. 42, 110.
[7] *See* R. Doc. 65-1 at p. 6.
[8] *See id.* at p. 2; R. Doc. 65-7, *Affidavit for Arrest Warrant*, at p. 1.
[9] *See* R. Doc. 65-7, *Affidavit for Arrest Warrant*, at p. 1.
[10] *See* R. Doc. 65-2, *Declaration of Dennis Serena ("Serena Decl.")*, at ¶¶ 5–10; R. Doc. 65-7, *Arrest Warrant*, at p. 3.
[11] *See* R. Doc. 65-2, *Serena Decl.*, at ¶¶ 11–12.

could effectuate his arrest.[12]  Serena crafted a plan whereby Aples would enter with his car into an alleyway adjacent to Yulman Grill, where Aples had worked, and then an unmarked TUPD truck would block the entrance to the alleyway, trapping Aples and allowing TUPD officers to arrest him.[13]  To execute the arrest plan, Serena recruited Sgt. Dew, Officers Elfer and Winchester, and Detective David Harris.[14] Dew and Harris were tasked with blocking the alleyway with the truck while Serena, Elfer, and Winchester were charged with confronting Aples on foot, with Elfer and Winchester providing Serena cover for Aples's arrest.[15]  Serena informed the other officers of the warrant and the charges against Aples and of Aples's criminal history, including a second-degree murder conviction.[16]

At around 1:00 p.m. on September 6, 2019, Aples arrived on campus to pick up his paycheck, driving a white sedan with dark tinted windows.[17]  Aples turned right into the alleyway off Ben Weiner Drive and collected his paycheck.[18]  At that moment, Serena ordered Dew and Harris to block the alleyway entrance with their unmarked police truck.[19]  Dew and Harris exited the parking garage adjacent to the alleyway where they had been waiting and immediately turned around to blockade the alleyway.[20]  Dew and Harris then activated the truck's strobe lights and exited the

---

[12] *See id.*
[13] *See id.* at ¶ 13.
[14] *See id.* at ¶ 14.
[15] *See id.*
[16] *See id.*
[17] *See id.*; R. Doc. 65-11, *Yulman Video*, at 0:00–0:12; R. Doc. 73-3.
[18] *See* R. Doc. 65-11, *Yulman Video*, at 0:00–0:12.
[19] *See* R. Doc. 65-2, *Serena Decl.*, at ¶ 15.
[20] *See id.*; R. Doc. 65-11, *Yulman Video*, at 0:39–0:52.

vehicle, both in full police uniform.[21]  Although the TUPD truck blocked the entrance to the alleyway, Aples successfully backed his car out of the alleyway by driving over the curb and the sidewalk and around the truck, brushing Harris in the process.[22] Aples narrowly missed hitting a female bystander as he reversed out of the alleyway.[23]

At this moment, with Aples having evaded the truck blockade, Serena, Elfer, and Winchester arrived on scene with guns drawn.[24]  Elfer and Winchester were wearing full police uniform while Serena was wearing a police badge.[25]  Serena and Winchester, both with guns drawn, banged on Aples's driver's side windows with the intent to break them to physically remove Aples from his car.[26]  Meanwhile, Dew and Harris both had their guns drawn and were standing in front of Aples's car, Harris just several steps away from the car.[27]  Within a second, while both Dew and Harris were still in front of the vehicle, Aples placed his car in drive and began accelerating.[28]  As Aples accelerated—the squealing of tires audible on the body worn cameras of Elfer and Winchester[29]—Harris maneuvered to the passenger side of Aples's vehicle and, within a split second, fired two rounds into Aples's car, hitting

---

[21] *See* R. Doc. 65-4, *Declaration of David Harris* ("*Harris Decl.*"), at ¶ 4; R. Doc. 65-11, *Yulman Video*, at 0:50–0:57.

[22] *See* R. Doc. 65-4, *Harris Decl.*, at ¶ 4; R. Doc. 65-11, *Yulman Video*, at 0:56–0:59.

[23] *See* R. Doc. 65-2, *Serena Decl.*, at ¶ 16; R. Doc. 65-9, *Elfer Video*, at 1:40–1:44.

[24] *See* R. Doc. 65-2, *Serena Decl.*, at ¶ 17; R. Doc. 65-9, *Elfer Video*, at 1:40–1:45.

[25] *See* R. Doc. 65-2, *Serena Decl.*, at ¶ 17.

[26] *See id.* at ¶ 18; R. Doc. 65-6, *Declaration of Matthew Winchester* ("*Winchester Decl.*"), at ¶ 7; R. Doc. 65-9, *Elfer Video*, at 1:44–1:46.

[27] *See* R. Doc. 65-9, *Elfer Video*, at 1:45.

[28] *See id.* at 1:45–1:46; R. Doc. 65-2, *Serena Decl.*, at ¶ 19; R. Doc. 65-10, *Winchester Video*, at 1:45–1:46.

[29] *See* R. Doc. 65-9, *Elfer Video*, at 1:45–1:48; R. Doc. 65-10, *Winchester Video*, at 1:46–1:48; R. Doc. 65-2, *Serena Decl.*, at ¶ 19.

Aples in the abdomen.[30]  Just as Harris fired his gun, Dew jumped out of the way of Aples's car as Aples sped away.[31]  Neither Harris nor any other officer subsequently fired their weapon.[32]

The TUPD officers then entered their truck in an attempt to follow Aples.[33] Aples crashed his car into an unrelated vehicle at an intersection and then exited the vehicle.[34]  Aples was eventually taken to an emergency room and underwent surgery as a result of the gunshot wound.[35]

On September 9, 2020, Plaintiffs filed a Complaint against various defendants regarding the incident.[36]  Plaintiffs' Complaint alleges civil rights claims for false arrest, illegal seizure, and excessive force under 28 U.S.C. § 1983 arising out of the incident.[37]  This Court previously granted Defendant Sodexo, Inc.'s Motion to Dismiss[38] and the Tulane Defendants' Rule 12(b)(6) Motion to Dismiss.[39] Accordingly, only the excessive force claims against Defendant Harris in his individual capacity remain at this stage.

The Tulane Defendants now move for summary judgment on the remainder of Plaintiffs' remaining claims.[40]  Specifically, Defendants' Motion for Summary

---

[30] *See* R. Doc. 65-9, *Elfer Video*, at 1:46–1:47; R. Doc. 65-10, *Winchester Video*, at 1:46–1:47; R. Doc. 65-4, *Harris Decl.*, at ¶ 5.
[31] *See* R. Doc. 65-9, *Elfer Video*, at 1:46–1:47; R. Doc. 65-10, *Winchester Video*, at 1:46–1:47; R. Doc. 65-11, *Yulman Video*, at 1:02–1:04; R. Doc. 65-5, *Declaration of Brian Dew* ("*Dew Decl.*"), at ¶ 8.
[32] *See* R. Doc. 65-4, *Harris Decl.*, at ¶ 7.
[33] *See* R. Doc. 65-2, *Serena Decl.*, at ¶ 20; R. Doc. 65-10, *Winchester Video*, at 2:00–5:29.
[34] *See* R. Doc. 65-13, at 0:09–0:11.
[35] *See* R. Doc. 73-9. It is the Court's understanding that Aples's death years later was unrelated to his incident. *See* R. Doc. 100.
[36] *See* R. Doc. 1.
[37] *See id.*
[38] R. Doc. 37.
[39] R. Doc. 110.
[40] R. Doc. 65.

Judgment seeks summary judgment on Plaintiffs' claims for excessive force brought against Defendant Harris.[41]  The Defendants argue that they are entitled to qualified immunity on Plaintiffs' excessive force claims because the Plaintiffs cannot demonstrate that the Defendants violated a clearly established right.   The Defendants contend that the undisputed facts show that Harris's use of force against Aples was not objectively unreasonable and not excessive because Harris reasonably believed that Aples "posed an immediate threat to officers and others."[42]   Harris' belief in the threat posed by Aples was reasonable under the totality of the circumstances, the Defendants maintain, given Aples's evasion of uniformed officers and his quick acceleration of his car in the direction of Officer Dew.  They further argue in the alternative that Plaintiffs cannot identify any clearly established law that the Defendants supposedly violated.  Accordingly, Defendants contend that the excessive force claims should be dismissed on the basis of qualified immunity even if the officers' use of force could be characterized as clearly excessive or objectively unreasonable.

Plaintiffs oppose the Motion.[43]  Plaintiffs maintain that consideration of the *Graham* factors shows that the force employed by the Defendants was unreasonable and clearly excessive.  First, they argue that the force employed against Aples was clearly excessive because "[t]here were no ongoing violations in the instant case"[44]

---

[41] The Motion also addresses Plaintiffs' since-dismissed claims against each Defendant for false arrest, unreasonable seizure, and excessive force (with the exception of the claim against Harris) and the *Monell* claims against Tulane University.  Because those claims have been dismissed, the Court does not address Defendants' arguments as to them.

[42] R. Doc. 65-1 at p. 21.

[43] R. Doc. 73.

[44] *Id.* at p. 8.

and because the alleged criminal conduct for which Aples was being arrested—the August 23, 2019 masturbation—was not a "major crime."[45]   Next, the Plaintiffs contend that Aples did not pose an immediate safety threat to either the officers or the public.   The Plaintiffs argue that the officers "were not in harm's way" and that the video footage shows that the officers were not in front of Aples's vehicle and that the first shot occurred while the car was stationary.[46]   The Plaintiffs next argue that Aples "did not actively resist TUPD deputies," offered only "passive" resistance to TUPD officers, and that the TUPD officers made no attempt to use any de-escalation measures before employing deadly force.[47]

Further, Plaintiffs argue that the Defendants' use of force was objectively unreasonable under clearly established law.   In support of this assertion, Plaintiffs largely reiterate their argument regarding the *Graham* factors.   Plaintiffs assert that Aples "was suspected of a lower grade offense," that the officers "were not in harm's way" when the deadly force was applied, and that the TUPD officers failed to employ "measured and ascending responses" in response to Aples's resistance.[48]   Plaintiffs also contend that there are disputed issues of fact, although they do not specify which issues are genuinely disputed.

Finally, Plaintiffs assert that "[n]o reasonable person would say that a traffic stop should be conducted by numerous officers trying to shatter glass onto a six-year-

---

[45] *Id.*
[46] *Id.* at pp. 9, 15.
[47] *Id.* at pp. 9–14.
[48] *Id.* at pp. 14–17.

old and then shoot through the passenger side, where said six-year-old is."[49]
Plaintiffs also extensively cite to a report from their use of force expert, Paul Lozada,
who opines on the credibility of the TUPD officers as well as the reasonableness of
their uses of force.[50]  Accordingly, Plaintiffs argue that the Motion for Summary
Judgment should be denied due to alleged outstanding factual disputes.

The Defendants filed a Reply in support of their Motion.[51]  First, they argue
that Plaintiffs misconstrue the facts in denying that Harris discharged his weapon as
Aples was accelerating towards Dew.  According to the Defendants, the video evidence
clearly establishes that "Detective Harris discharged his gun as Aples completed a 'k-
turn' and began driving, with screeching tires, in the direction of Brian Dew."[52]
Second, the Defendants argue that the Plaintiffs have waived any argument
pertaining to any claims under the Fourteenth Amendment and to the claims for false
arrest and unreasonable seizure.[53]  Next, the Defendants contend that the Plaintiffs
misconstrue the *Graham* factors and have failed to provide any evidence to rebut the
sworn declarations of the Defendant officers.  Further, the Defendants argue that the
Plaintiffs have failed to identify any clearly established law that the Defendants
purportedly violated.  Finally, the Defendants argue that the Court should disregard
the materials referenced in footnotes 8 through 12 of the Plaintiffs' response in

---

[49] *Id.* at p. 19.
[50] *Id.* at pp. 19–21.
[51] R. Doc. 81.
[52] *Id.* at p. 2.
[53] *Id.* at p. 3.  This Court has already dismissed any and all claims for false arrest and unreasonable
seizure apart from the excessive force claim against Defendant Harris.  To the extent that the Plaintiffs
have also stated any claims under the Fourteenth Amendment, such claims have not been developed
or pressed by the Plaintiffs and therefore have been waived.

opposition because those materials were not previously disclosed by the Plaintiff and are inadmissible at trial and should also disregard Plaintiffs' list of alleged factual disputes because Plaintiffs provided no support for their assertions. Furthermore, the Defendants ask the Court to disregard the opinions of Plaintiffs' expert, Paul Lozada, for the reasons expressed in their separate motion *in limine*.[54]

## I.   LEGAL STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[55]  A dispute is "genuine" if it is "real and substantial, as opposed to merely formal, pretended, or a sham."[56]  Further, a fact is "material" if it "might affect the outcome of the suit under the governing law."[57]  When assessing whether a genuine dispute regarding any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[58]  While all reasonable inferences must be drawn in favor of the nonmoving party, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions or "only

---

[54] *See* R. Doc. 66.

[55] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

[56] *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)).

[57] *Liberty Lobby*, 477 U.S. at 248.

[58] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citations omitted).

a scintilla of evidence."[59]  Instead, summary judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party.[60]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."[61]  The non-moving party can then defeat summary judgment by either submitting evidence sufficient to demonstrate the existence of a genuine dispute of material fact or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[62]  If, however, the nonmoving party will bear the burden of proof at trial on the dispositive issue, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[63]  The burden then shifts to the nonmoving party who must go beyond the pleadings and, "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[64]  "When there is video evidence in the record, courts are not bound to accept the nonmovant's version of the facts if it is contradicted by the video."[65] However, "a court should not discount the nonmoving party's story unless

---

[59] *Id*. (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)) (internal quotation marks omitted).

[60] *Id*. at 399 (citing *Liberty Lobby*, 477 U.S. at 248).

[61] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991).

[62] *Id*. at 1265.

[63] *See Celotex*, 477 U.S. at 322–23.

[64] *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)).

[65] *Crane v. City of Arlington*, No. 21-10644, 2022 WL 4592035, at *4 (5th Cir. Sept. 30, 2022) (citing *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014)).

the video evidence provides so much clarity that a reasonable jury could not believe his account."[66]

"A qualified immunity defense alters the usual summary judgment burden of proof."[67]  "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law."[68]  However, when considering a qualified immunity defense, the court must still view the evidence in the light most favorable to the nonmoving party and draw all inferences in the nonmoving party's favor.[69]

## II.   ANALYSIS

Title 42 U.S.C. § 1983 creates a damages remedy for the violation of federal constitutional or statutory rights under color of state law.  Specifically, § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.[70]

Because § 1983 merely provides a remedy for designated rights without creating any substantive rights, "an underlying constitutional or statutory violation is a predicate

---

[66] *Darden v. City of Fort Worth*, 880 F.3d 722, 730 (5th Cir. 2018) (citing *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013)).
[67] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).
[68] *Id.*
[69] *Rosado v. Deters*, 5 F.3d 119, 122–23 (5th Cir. 1993).
[70] 42 U.S.C. § 1983.

to liability."[71]  To establish § 1983 liability, the plaintiff must establish the following three elements: (1) deprivation of a right secured by the United States Constitution or federal law; (2) by a state actor; (3) that occurred under color of state law.[72]

As a defense to § 1983 claims, government officials may invoke qualified immunity, which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[73]  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[74]  The Supreme Court has made clear that qualified immunity functions as an immunity from suit, rather than a mere defense to liability.[75]  "[T]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"[76]  "This means that even law enforcement officials who reasonably but mistakenly commit a constitutional violation are entitled to immunity."[77]  "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent

---

[71] *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citation omitted).

[72] *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004) (citation omitted).

[73] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[74] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[75] *Id*. at 237 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (internal quotation marks omitted)).

[76] *Brumfield v. Hollins*, 551 F.3d 322, 326–27 (5th Cir. 2008) (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)).

[77] *Bazan*, 246 F.3d at 488 (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 312 (5th Cir. 2001) (internal quotation marks omitted)).

'squarely governs' the specific facts at issue."[78]  Once the government official asserts the defense of qualified immunity, the burden shifts to the plaintiff to negate the defense.[79]

To overcome a claim of qualified immunity, a plaintiff must demonstrate: (1) that the official violated a statutory or constitutional right; and (2) that the right was "clearly established" at the time of the challenged conduct.[80]  Put differently, a government official's liability "generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken."[81]  When deciding whether the right allegedly violated was 'clearly established,' [a] court asks whether the law so clearly and unambiguously prohibited the conduct that every reasonable official would understand that what he is doing violates the law."[82]  In other words, precedent existing at the time of the challenged conduct "must have placed the statutory or constitutional question beyond debate."[83]

It is within the district courts' discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case.[84]  Because a plaintiff's failure to demonstrate a

---

[78] *Kisela v. Hughes*, 138 S. Ct 1148, 1153 (2018) (quoting *Mullenix v. Luna*, 577 U.S. —, 136 S. Ct. 305, 309 (2015)).

[79] *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citation omitted).

[80] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted).

[81] *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

[82] *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013); *see also Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) ("A government official's acts are not objectively unreasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights.").

[83] *al-Kidd*, 563 U.S. at 741.

[84] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

violation of their constitutional rights ends the qualified immunity inquiry, the Court first addresses whether the Plaintiffs have demonstrated that the Defendants violated Aples's right against excessive force under the Fourth Amendment.[85]

The sole remaining claim in this action is one for excessive force against Defendant Harris, the only Defendant to have shot Aples.  To prevail on the Fourth Amendment excessive force claim, Plaintiffs must demonstrate "(1) an injury, (2) resulting directly and only from excessive force, (3) that was objectively unreasonable."[86]  It is undisputed that Aples suffered an injury at the hands of Harris.  Instead, the parties dispute whether Harris's use of deadly force was excessive and whether it was reasonable.  For the following reasons, the Court concludes that Harris's use of deadly force—the shooting of Aples—was not excessive and was objectively reasonable and therefore grants summary judgment in favor of the Defendants.

At issue here is whether Defendant Harris's shooting of Aples was excessive and unreasonable.  An officer's use of deadly force is both excessive and unreasonable "unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."[87]  The Fifth Circuit has noted that the questions of whether force was excessive and unreasonable are "often

---

[85] *See Lytle v. Bexar Cnty.*, 560 F.3d 404, 410 (5th Cir. 2009) ("If we determine that the alleged conduct did not violate a constitutional right, our inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity.").

[86] *Argueta v. Jaradi*, No. 22-40781, —F. 4th—, 2023 WL 7974744, at *3 (5th Cir. Nov. 17, 2023) (citing *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018)).

[87] *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018)); *see also Argueta*, 2023 WL 7974744, at *3 ("An officer's use of deadly force is not unreasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." (citing *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003))).

intertwined."[88]   The answer to these "intertwined" questions thus depends on whether Aples posed a serious threat of physical harm to the TUPD officers or others at the moment Harris discharged his firearm.[89]   If yes, then Harris's use of deadly force was neither excessive nor unreasonable.   But if not, then Aples has proven that Harris violated his Fourth Amendment right against excessive force.   At the summary judgment stage, if either of those questions involve genuine disputed issues of fact, summary judgment should be denied.

Determining whether the force used by an officer was objectively unreasonable "requires careful attention to the facts and circumstances of [the] particular case."[90] A district court may consider "(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."[91]   In considering these factors, referred to as the *Graham*[92] factors, the overarching question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."[93]   The Court is mindful that the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, *rather than with the 20/20 vision of hindsight*."[94] After all, "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of

---

[88] *Roque*, 993 F.3d at 333 (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)).
[89] *See id.*
[90] *Argueta*, 2023 WL 7974744, at *3 (quoting *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017)).
[91] *See id.*; *see also Romero v. City of Grapevine*, 888 F.3d 170, 177 (5th Cir. 2018).
[92] *Graham v. Connor*, 490 U.S. 386 (1989).
[93] *Trammell*, 868 F.3d at 340 (quoting *Graham*, 490 U.S. at 397).
[94] *Id.* (quoting *Graham*, 490 U.S. at 396) (emphasis added).

force that is necessary in a particular situation."[95]  The Court considers only the facts "knowable to the defendant officers" at the moment the officers used force and avoids "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."[96]

Plaintiffs dispute the TUPD officers' "claims of fearing being hit by a vehicle" and instead contend that the officers were "not in harm's way" at the time of the shooting because no officers were either in front of Aples's car or on a collision course with his vehicle and because Harris first fired while Aples's car was stationary.[97] Plaintiffs argue that Aples offered, "at most, only passive resistance" which did not justify the immediate use of force.[98] Plaintiffs further argue that these factual disputes, *i.e.*, the timing of the shots and the direction of Aples's car, are genuine factual disputes precluding summary judgment at this time.[99]  The Court disagrees. To the extent that the Plaintiffs claim a factual dispute as to whether Aples's flight from arrest posed any risk to the officers or to the public, the Court notes that that is a question of law left to the Court, not a question of fact.[100]   Plaintiffs have only generically claimed the existence of a factual dispute as to whether Aples was fleeing throughout their response in opposition to the Motion without providing sufficient

---

[95] *Graham*, 490 U.S. at 397.
[96] *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (quoting *Garza v. Briones*, 943 F.3d 740, 745 (5th Cir. 2019)).
[97] R. Doc. 73 at pp. 9, 15.
[98] *Id.* at pp. 1, 9, 10.
[99] *See id.*
[100] *See Argueta v. Jaradi*, No. 22-40781, —F. 4th—, 2023 WL 7974744, at *6 (5th Cir. Nov. 17, 2023) ("[W]hether the suspect's flight posed a threat to the officers or onlookers is a question of law left to the court.").

record evidence to contradict the Defendants' version of events.[101]   Likewise, the Plaintiffs' generic assertions in response to the Defendants' Local Rule 56.1 Statement of Undisputed Facts fail to provide the Court with any sufficient record support.[102]   Plaintiffs have identified several factual allegations that they dispute but do not supply any evidence to support their contentions.   Rule 56(c)(1) requires a party asserting that a fact is genuinely disputed to support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electrotonically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials."[103]   Plaintiffs have failed to do so and, instead, simply labelled various of Defendants' Statement of Uncontested Facts as "Disputed."

Aples has provided only his own characterization of the events in his briefing, unsupported by—and indeed contrary to—record evidence.   Aples's reliance on his use of force expert, Paul Lozada, is unhelpful to his case.   Lozada's expert report does not demonstrate any genuine factual dispute as Lozada's characterization of the events is contradicted by the video evidence.   The Court will not defer to an expert's version of events that is unsupported by record evidence.[104]   Moreover, the Court disregards Lozada's report insofar as he opines on the legal questions of whether the officers reasonably feared for their own safety and whether the force utilized was

---

[101] *See, e.g.*, R. Doc. 73 at p. 17 ("In this case, there are disputed issues of fact."); *id.* at p. 21 ("The evidence and arguments discussed above creates a genuine fact issue . . . .").
[102] *See* R. Doc. 73-10.
[103] Fed. R. Civ. P. 56(c)(1).
[104] *See* Fed. R. Evid. 701(b) (noting that an expert's opinion must be based on "sufficient facts or data").

reasonable. Such opinions go beyond the purview of expert testimony and infringe on the province of the Court to resolve questions of law.[105] The Court views the evidence in the light most favorable to the Plaintiff and draw all inferences in his favor.

To the extent that the Plaintiffs rely on the video evidence in the record to bolster their claim of a factual dispute, the Court finds that the video evidence does not support Plaintiffs' account of events. "When there is video evidence in the record, courts are not bound to accept the nonmovant's version of the facts if it is contradicted by the video."[106] While viewing the evidence in a light most favorable to Plaintiffs, the Court has viewed and considers the following videos in its review of the events at issue here: body-worn camera ("BWC") footage from Defendants Elfer (the "Elfer Video")[107] and Winchester (the "Winchester Video")[108] and surveillance footage from Yulman Plaza (the "Yulman Video").[109] As Defendants Elfer and Winchester were next to or near each other during the relevant portion of events, their respective BWC footage is largely similar albeit from slightly different perspectives.

The video evidence supports Harris's claim that he reasonably believed that Aples posed a serious threat to Officer Dew and others as Aples sped away in his car. Specifically, and contrary to the Plaintiffs' contentions, the videos reflect that Harris

---

[105] *See Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020) ("Experts cannot 'render conclusions of law' or provide opinions on legal issues. . . . It is therefore error to allow expert testimony on whether an officer used unreasonable force.") (citations omitted).

[106] *Crane v. City of Arlington*, No. 21-10644, 2022 WL 4592035, at *4 (5th Cir. Sept. 30, 2022) (citing *Harris v. Serpas*, 745 F.3d 767, 771 (5th Cir. 2014)).

[107] R. Doc. 65-9, *Elfer Video*.

[108] R. Doc. 65-10, *Winchester Video*.

[109] R. Doc. 65-11, *Yulman Video*.

fired his weapon as Aples's car was accelerating and that Officer Dew was in the direct path of Aples's accelerating car within a split second of the shots. The Yulman Video shows Tulane officers attempting to block Aples's exit from the parking garage by stopping a dark colored truck with a flashing red light in the front window at the exit.[110] In both the Elfer and Winchester Videos, Aples can be seen reversing his car out of the alleyway near Yulman Grill, over the sidewalk, and around the blockade set up by Harris and Dew, nearly hitting a female bystander in the process.[111] Several other cars drive by within seconds of the shooting, with one car being within feet of Aples's car at the time of the shooting.[112] The video shows that, as Aples drives in reverse, Serena, Elfers, and Winchester rush towards Aples's car.[113] The female bystander can be seen very near the back of Aples's car within seconds of the car reversing and before the car is driven away.[114] One of the officers can be heard yelling "watch out."[115] Serena approaches Aples's front driver's side window while Aples is still reversing.[116] Serena points his firearm at the driver's side of the car and bangs on the window.[117] Winchester is a few steps behind Serena at this point.[118] Meanwhile, both Harris and Dew are several feet in front of Aples's car, with Harris a few steps in front of Dew.[119] Aples quits reversing and comes to a brief stop for a

---

[110] R. Doc. 65-11, *Yulman Video*, at 0:51–1:40.

[111] *See* R. Doc. 65-9, *Elfer Video*, at 1:40–1:43; R. Doc. 65-10, *Winchester Video*, at 1:36–1:43; R. Doc. 65-2, *Serena Decl.*, at ¶ 16; *see also* R. Doc. 65-11, *Yulman Video*, at 0:56–0:59.

[112] R. Doc. 65-11, *Yulman Video*, at 0:59–1:05.

[113] *See* R. Doc. 65-9, *Elfer Video*, at 1:40–1:43; R. Doc. 65-10, *Winchester Video*, at 1:36–1:43.

[114] R. Doc. 65-10, *Winchester Video*, at 1:42–1:43.

[115] *Id.*

[116] *See* R. Doc. 65-9, *Elfer Video*, at 1:43–1:44; R. Doc. 65-10, *Winchester Video*, at 1:43–1:44.

[117] *See* R. Doc. 65-9, *Elfer Video*, at 1:43–1:45; R. Doc. 65-10, *Winchester Video*, at 1:43–1:45.

[118] *See* R. Doc. 65-9, *Elfer Video*, at 1:43–1:45; R. Doc. 65-10, *Winchester Video*, at 1:41–1:45.

[119] *See* R. Doc. 65-9, *Elfer Video*, at 1:43–1:45; R. Doc. 65-10, *Winchester Video*, at 1:43–1:45.

fraction of a second.[120]  Less than a second later, and just as Winchester reaches the rear driver's side door with his gun drawn, Aples begins to accelerate his vehicle.[121] At this moment, Aples's car wheels are turned to the right in the direction of both Dew and Harris.[122]  Aples's tires squeal as he accelerates.[123]  As Aples is accelerating, Harris maneuvers from the front of the car to the passenger side, still only a few feet away at most.[124]   In addition to other cars driving by within seconds of this interaction, another car drives within feet of Aples's car as the latter car speeds forward.[125]  Right as Harris reaches the passenger side of Aples's car, Harris fires his weapon at the car.[126]  Contrary to Aples's contention, the videos show that Aples's car was moving forward and was not "stationary" at the moment Harris fired his weapon.[127]  Moreover, and again contrary to Aples's argument, the videos show that Officer Dew was in front of Aples's car just as Harris discharged his firearm.[128] Although somewhat obscured by trees, the Yulman Video clearly shows that Dew was standing directly in the path of Aples's car and that Harris fired nearly simultaneous to Dew's dodging of Aples's car.[129]  The Yulman video also clearly shows another vehicle very close to the path of Aples's car as the car is quickly driven away.[130]  Aples then speeds away and no further shots are fired.[131]

[120] *See* R. Doc. 65-9, *Elfer Video*, at 1:44; R. Doc. 65-10, *Winchester Video*, at 1:44–1:45.
[121] *See* R. Doc. 65-9, *Elfer Video*, at 1:45; R. Doc. 65-10, *Winchester Video*, at 1:45.
[122] *See* R. Doc. 65-9, *Elfer Video*, at 1:45.
[123] *See* R. Doc. 65-9, *Elfer Video*, at 1:45–1:48; R. Doc. 65-10, *Winchester Video*, at 1:46–1:48.
[124] *See* R. Doc. 65-9, *Elfer Video*, at 1:45–1:46; R. Doc. 65-10, *Winchester Video*, at 1:44–1:46.
[125] R. Doc. 65-10, *Yulman Video*, at 0:59–1:05.
[126] *See* R. Doc. 65-9, *Elfer Video*, at 1:45–1:47; R. Doc. 65-10, *Winchester Video*, at 1:46–1:47.
[127] *See* R. Doc. 73 at pp. 9, 15.
[128] *See* R. Doc. 65-9, *Elfer Video*, at 1:44–1:47; R. Doc. 65-10, *Winchester Video*, at 1:46–1:47.
[129] *See* R. Doc. 65-11, *Yulman Video*, at 1:02–1:04.
[130] R. Doc. 65-10, *Yulman Video*, at 0:59–1:05.
[131] *See id.* at 1:04–1:08.

In sum, the video evidence clearly shows that Aples (1) evaded a police blockade, (2) ignored several armed officers pointing firearms at him and attempting to break his windows, and (3) accelerated his car in the direction of two officers, Dew and Harris.  Moreover, the video evidence shows that Harris discharged his firearm while Aples's car was moving forward in Dew's direction.[132]  Plaintiffs' version of events is not supported by the video evidence.  While a "warning must be given, *when feasible*, before the use of deadly force,"[133] here, no such warning was feasible under the circumstances given the "rapidly evolving"[134] and quick situation; it is undisputed that the relevant events took place within a matter of seconds.  Harris had no time to issue any warning with Aples's car accelerating towards Dew.

Moreover, Plaintiffs' contention that the officers failed to use "measured and ascending responses" is belied by the video and is meritless.[135]  The TUPD officers attempted to stop Aples by aiming their firearms at the car and by attempting to break his car windows to physically apprehend him.[136]  Further, Harris only employed lethal force once it became clear that Aples was evading arrest and posed a threat to other officers and perhaps bystanders by quickly accelerating his car in the officer's direction.  Police are not allowed to use unreasonable *excessive* force; there is no requirement that they bring a knife to a gun fight.  Officers are not required to meet deadly force with minimal force in the vain hope that a suspect

---

[132] *See* R. Doc. 65-9, *Elfer Video*, at 1:44–1:47; R. Doc. 65-10, *Winchester Video*, at 1:46–1:47.
[133] *Poole v. City of Shreveport*, 13 F.4th 420, 425 (5th Cir. 2021) (citing *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc)).
[134] *Graham v. Connor*, 490 U.S. 386, 397 (1989).
[135] R. Doc. 73 at pp. 13–14, 16–17 (quoting *Newman v. Guedry*, 703 F.3d 757, 767 (5th Cir. 2012)).
[136] *See* R. Doc. 65-9, *Elfer Video*, at 1:43–1:45; R. Doc. 65-10, *Winchester Video*, at 1:43–1:45.

changes their mind and backs down.  Given that Aples was accelerating a vehicle while the TUPD officers were on foot, Harris's use of force was both proportional and appropriate under the circumstances.[137]  Plaintiffs have failed to demonstrate that any lesser force would have been appropriate.

As Harris explains in his Declaration, he "fired [his] gun because [he] saw that Dew was in front of Aples' car, had seen Aples' reckless operation of the vehicle, observed that Aples was accelerating his car in the wrong lane and towards Dew, and believed that Aples and his car posed a risk of killing or seriously injuring Dew or others in the vicinity."[138] Both the video evidence as well as the declarations of the other officers support Harris's version of events. Indeed, all other officers on scene state that Harris fired his gun at Aples while Aples was accelerating the car towards Dew.[139]  Dew, in particular, explains that "as Aples placed his car in drive, [he] was in front of the car and in the direction of the car's path" and that, before he was able to get out of the car's way, and "with Aples' car pointed at me and accelerating, Harris fired his gun at Aples' car."[140]  The record and video evidence does not support Plaintiffs' claim that Aples offered, "at most, only passive resistance."

---

[137] *Cf. Joseph v. Lopinto*, No. 21-30672, 2023 WL 4198884, at *3 (5th Cir. June 27, 2023) ("Here, the officers' use of force was reasonable under the *Graham* factors. . . . [W]hen Joseph threw his car into reverse, he 'weaponized' it against the JPSO personnel at the scene—and against others who were in the vicinity.").

[138] R. Doc. 65-4, *Harris Decl.*, at ¶ 6; *see also id.* at ¶ 7 ("I only fired my gun while Aples' car was accelerating towards Dew.").

[139] *See* R. Doc. 65-2, *Serena Decl.*, at ¶¶ 19–20 ("Harris only fired his gun while Aples' car was accelerating towards Dew."); R. Doc. 65-5, *Dew Decl.*, at ¶¶ 8–9 ("[A]s Aples placed his car in drive, I was in front of the car and in the direction of the car's path. . . . Harris only fired his gun while Aples' car was accelerating towards me."); R. Doc. 65-3, *Declaration of Joseph Elfer* ("*Elfer Decl.*"), at ¶¶ 11–12 ("[W]ith Aples' car pointed at Dew and accelerating, Defendant Harris fired his gun at Aples' car."); R. Doc. 65-6, *Winchester Decl.*, at ¶¶ 8–9 (same).

[140] R. Doc. 65-5, *Dew Decl.*, at ¶ 8.

Given the foregoing, the Court finds that Harris reasonably believed that Aples posed a serious risk of harm to Officer Dew at the moment he employed deadly force.[141] The videos support that Harris was forced to make a "split-second judgment" in a "tense, uncertain, and rapidly evolving" situation.[142] Recognizing that the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight,"[143] the Court finds Harris's use of deadly force against Aples was reasonable and not excessive under the circumstances. The foregoing facts and circumstances, when viewed in their entirety and in a light most favorable to Plaintiff, created a scenario sufficiently "tense, uncertain, and rapidly evolving" to place Detective Harris's use of force within the acceptable use of force realm.[144] Accordingly, because Harris did not violate Plaintiffs' Fourth Amendment rights, the Court grants summary judgment to Harris on the basis of qualified immunity.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Tulane Defendants' Motion for Summary Judgment[145] is **GRANTED.**

---

[141] The severity of the underlying offense also points toward a finding of reasonableness, although not as strongly as the other *Graham* factors. Here, the TUPD was attempting to arrest Aples on charges of felony obscenity and misdemeanor simple assault. While not the most severe offenses, the Court rejects Plaintiffs' characterization of these offenses as minor and a "ridiculous, fantastical, and bombastic story." R. Doc. 73 at p. 8.

[142] *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[143] *Id.* at 396.

[144] *Tucker v. City of Shreveport*, 998 F. 3d 165, 171 (5th Cir. 2021) (quoting *Graham*, 490 U.S. at 396–97).

[145] R. Doc. 65.

**IT IS FURTHER ORDERED** that any and all remaining claims asserted by the Plaintiffs against all Defendants are **DISMISSED with prejudice**.

New Orleans, Louisiana, December 28, 2023.

**WENDY B. VITTER**
**United States District Judge**